1

2

3           **UNITED STATES DISTRICT COURT**

4           **NORTHERN DISTRICT OF CALIFORNIA**

5           **SAN JOSE DIVISION**

6

7    RIGOBERTO SARMIENTO, et al.,          Case No.  20-cv-07974-BLF

8                    Plaintiffs,

9           v.                             **ORDER DENYING DEFENDANTS**
                                           **FRESH HARVEST, INC. AND SMD**
10   FRESH HARVEST, INC.,, et al.,         **LOGISTICS, INC.'S SUMMARY**
                                           **JUDGMENT MOTION AS TO**
11                   Defendants.           **RIGOBERTO SARMIENTO;**
                                           **TERMINATING AS MOOT SUMMARY**
12                                         **JUDGMENT MOTION AS TO**
                                           **GUSTAVO LUEVANO-VACA**
13
                                           [Re:  ECF Nos. 28, 72]
14

15          Before the Court are Defendants Fresh Harvest, Inc. and SMD Logistics, Inc.'s (collectively,

16   "Fresh Harvest") Motions for Summary Judgment against Plaintiffs Rigoberto Sarmiento and

17   Gustavo Luevano-Vaca in this labor class action involving domestic and foreign H-2A agricultural

18   truck drivers.  Sarmiento, a domestic truck driver formerly employed by Defendant Fresh Foods,

19   Inc. (collectively with Defendant Rava Ranches, Inc., "Fresh Foods"), and Luevano-Vaca, a former

20   H-2A worker for Fresh Harvest and Mexican national, bring claims against Fresh Harvest and Fresh

21   Foods for (1) violations of the California Labor Code, including for failure to provide minimum

22   wage, overtime wages, meal periods, rest breaks, and itemized wage statements and for waiting time

23   penalties; (2) breach of employment contracts; and (3) breach of California's Unfair Competition

24   Law ("UCL").  *See* First Amended Complaint ("FAC"), ECF No. 53 ¶¶ 124–205.  Plaintiff

25   Sarmiento additionally brings a claim under the Agricultural Worker Protection Act ("AWPA").

26   *See id.* ¶¶ 114–123.

27          Fresh Harvest, along with SMD, is a farm labor contractor that provided H-2A truck drivers

28   to clients in California and Arizona, including Fresh Foods, to assist with work transporting crop

loads. Plaintiffs' claims primarily pertain to Defendants' failure to pay H-2A and domestic truck drivers required wages and provide benefits that they promised in H-2A job orders or were otherwise required to pay under the H-2A regulations, including by paying less than the required "prevailing wage rate." Sarmiento brings claims against both Fresh Foods and Fresh Harvest asserting that they were his co-employers since he worked alongside the H-2A truck drivers Fresh Harvest provided to Fresh Foods. Luevano-Vaca brings claims against Fresh Foods and Fresh Harvest because he was a foreign H-2A driver provided by Fresh Harvest as a truck driver for Fresh Foods. Fresh Harvest filed two motions for summary judgment, each directed to the claims of one of the two named Plaintiffs. *See* Sarmiento Motion, ECF No. 28-1; Luevano-Vaca Motion, ECF No. 72-1; Reply, ECF No. 139. Plaintiffs oppose. *See* Opposition, ECF No. 125. The Court consolidated Fresh Harvest's motions on August 5, 2021. *See* ECF No. 76.

Regarding Sarmiento's claims, Fresh Harvest argues that (1) there was never an employer-employee relationship between Fresh Harvest and Sarmiento under the AWPA or the California Labor Code because Sarmiento was an employee of Fresh Foods; (2) there was no employment contract between Fresh Harvest and Sarmiento, either directly or as a third-party beneficiary, and Sarmiento's only employment contract was with Fresh Foods; and (3) Sarmiento's UCL claim fails because of a lack of a prevailing wage rate applicable to Fresh Harvest's H-2A truck drivers. *See* Sarmiento Motion, ECF No. 28-1; Reply, ECF No. 139. In response, Sarmiento argues that (1) Fresh Harvest's control over Sarmiento, as demonstrated primarily by its control over H-2A workers it provided to Fresh Foods and other labor-related support it provided Fresh Foods in 2020, supports an employer-employee relationship between Fresh Harvest and Sarmiento under the AWPA and California Labor Code; (2) Sarmiento was a direct party to Fresh Harvest's H-2A job orders or a third-party beneficiary of Fresh Harvest's contracts with Fresh Foods; and (3) Fresh Harvest failed to properly move for summary judgment as to Sarmiento's UCL claim. *See* Opposition, ECF No. 125.

The primary dispute at issue in this Motion is whether the evidence demonstrates that Fresh Harvest had sufficient control over Sarmiento to support the existence of a co-employment relationship. Fresh Harvest points to evidence indicating no control, whereas Sarmiento points to

2

1   evidence of Fresh Harvest's control over Fresh Foods employees, including their wages and

2   schedules.  Fresh Harvest argues that Sarmiento's evidence is irrelevant, since much of it pertains

3   only to Fresh Harvest H-2A employees and events in 2020 after Sarmiento's termination from Fresh

4   Foods.

5       Regarding Luevano-Vaca's claims, Fresh Harvest argues that prior to joining this lawsuit,

6   Luevano-Vaca signed a settlement agreement releasing any claims against Fresh Harvest, so the

7   Court should grant summary judgment that Luevano-Vaca's claims were released and he is in breach

8   of contract by bringing them.  *See* Luevano-Vaca Motion, ECF No. 72-1, Reply, ECF No. 139.  In

9   response, Luevano-Vaca argues that the settlement agreement is void under 29 C.F.R. § 501.5,

10  which prevents a person from seeking to have an H-2A worker waive his or her rights under the H-

11  2A regulations outside of specific circumstances.  *See* Opposition, ECF No. 125.  These include

12  when a release is "in settlement of private litigation," which did not exist between Luevano-Vaca

13  and Fresh Harvest at the time the settlement agreement was signed.  *See id.*  Luevano-Vaca further

14  argues that the settlement agreement is void since it was executed through misleading statements in

15  coercive circumstances.  *See id.* at 24–25.  On reply, Fresh Harvest argues that the settlement

16  agreement is valid under 29 C.F.R. § 501.5 since it was "in settlement of private litigation," and

17  Luevano-Vaca's reading of the regulation would preempt California decisional and statutory law.

18  *See* Reply, ECF No. 139 at 12–15.  In granting Luevano-Vaca's motion to dismiss Fresh Harvest's

19  counterclaim based on the settlement agreement, the Court previously found the settlement

20  agreement to be void under 29 C.F.R. § 501.5.  *See* Order, ECF No. 147.

21      Based on the below reasoning, the Court DENIES Fresh Harvest's summary judgment

22  motion as to Sarmiento's AWPA, California Labor Code, breach of contract, and UCL claims.

23  Further, the Court finds that Fresh Harvest's summary judgment motion as to Luevano-Vaca is

24  MOOT.

25  **I.    BACKGROUND**

26      **A.    H-2A Visa Program**

27      At issue in this case are the requirements imposed on employers who participate in the H-2A

28  visa program, including wage requirements.  Congress created the H-2A visa program to allow

United States District Court
Northern District of California

employers to hire non-citizens to fill temporary agricultural jobs pursuant to certain regulatory requirements.   *See* 8 U.S.C. § 1188.   A petition to hire an H-2A employee requires a certification that "(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition" and "(B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed."   8 U.S.C. § 1188(a)(1). The Department of Labor ("DOL") is "authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment" under the H-2A visa program.   8 U.S.C. § 1188(g)(2).   The DOL has promulgated regulations implementing the H-2A visa program at 20 C.F.R. §§ 655.100–185 and 29 C.F.R. §§ 501.0–501.47.

Pursuant to the DOL's regulations, employers must file job orders containing the "material terms and conditions of employment," 20 C.F.R. § 655.103(b), with the DOL that comply with certain requirements, including "minimum benefit, wage, and working condition provisions[.]" 20 C.F.R. § 655.122(c).   "In the absence of a separate written work contract incorporating the required terms and conditions of employment, agreed to by both the employer and the worker, the work contract at a minimum will be the terms of the job order and any obligations required under 8 U.S.C. 1188, 28 CFR part 501, or [20 C.F.R. Part 655, Subpart B]."   20 C.F.R. § 655.103(b).   Courts have found that employees have contractual rights under the job order requirements.   *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 900 (9th Cir. 2013); *Frederick Cty. Fruit Growers Ass'n, Inc. v. Martin*, 968 F.2d 1265, 1268 (D.C. Cir. 1992).   The regulations also require H-2A employers to make certain assurances, including that they will "comply with all applicable Federal, State and local laws and regulations, including health and safety laws."   20 C.F.R. § 655.135(e).

The regulations in 29 C.F.R. Part 501 "cover the enforcement of all contractual obligations, including requirements under 8 U.S.C. 1188 and 20 CFR part 655, subpart B applicable to the employment of H-2A workers and workers in corresponding employment[.]"   29 C.F.R. § 501.0. These regulations include a provision prohibiting the waiver of an employee's rights under the H-2A

4

1    regulations at 29 C.F.R. § 501.5.

2        **B.    Summary Judgment Motion as to Sarmiento's Claims**

3        In support of its Motion as to Sarmiento's claims, Fresh Harvest provides the declarations

4    of (1) Oscar Montes, the Human Resources Compliance Officer for Fresh Foods, Inc.; (2) Suzanne

5    Rava, officer of Fresh Foods, Inc. and Rava Ranches, Inc.; and (3) Leticia Ridaura, Chief Operating

6    Officer of AgData Global, LLC and an officer of Fresh Harvest, Inc., which provide evidence of

7    Sarmiento's employment with Fresh Foods and his lack of a relationship with Fresh Harvest.  *See*

8    Appendix of Declarations, ECF No. 28-2.  Sarmiento relies on a variety of evidence including

9    deposition transcripts of Sarmiento, Luevano-Vaca, and other Fresh Harvest and Fresh Foods

10   employees, Fresh Harvest and Fresh Foods documents obtained through discovery, and declarations

11   of Luevano-Vaca and Sarmiento.  *See* ECF Nos. 126–30.  Below, the Court summarizes the

12   undisputed facts based on the parties filings, as well as the facts the parties present regarding the

13   disputed issue of Fresh Harvest's alleged control over Sarmiento.

14       Fresh Harvest, Inc. is a farm labor contractor that provides H-2A visa guest worker

15   agricultural labor to agricultural growers and food processors, including in California and Arizona.

16   *See* Ridaura Decl., ECF No. 28-2 ¶ 4.  SMD Logistics, Inc. is a logistics and maintenance company

17   specializing in trucking.  *See id.* ¶ 7.  Fresh Harvest, Inc. and SMD Logistics, Inc. are incorporated

18   in Arizona.  *See id.* ¶¶ 4, 7.  Fresh Harvest, Inc. and SMD Logistics, Inc. are sister corporations that

19   can trace their ownership back to a common entity.  *See* Scaroni Decl., ECF No. 72-2 ¶ 5.  SMD

20   Logistics, Inc. is responsible for managing H-2A truck drivers working for Fresh Harvest, Inc.,

21   including by dispatching drivers and managing their driving routes.  *See id.* ¶ 5.

22       Sarmiento argues that Fresh Harvest and SMD are a single, integrated entity.  *See*

23   Opposition, ECF No. 125 at 3–4.  Fresh Harvest does not argue that the two entities should be treated

24   separately.  Accordingly, throughout this order, the Court treats the companies as a single entity and

25   generally refers to Fresh Harvest, Inc. and SMD Logistics, Inc. collectively and interchangeably as

26   "Fresh Harvest" given the companies' close relationship.

27       Fresh Foods, Inc. is a large grower of crops in Salinas, California.  *See, e.g.,* Chan Decl.,

28   ECF No. 126, Ex. 107.  Fresh Foods, Inc. is a separate entity from Fresh Harvest.  It operates

United States District Court
Northern District of California

5

independently, and it has no co-ownership, joint ownership, or any overlapping ownership with Fresh Harvest.  *See* Rava Decl., ECF No. 28-2 ¶¶ 5–6.  Fresh Foods[1] additionally has its own management structure and managerial employees separate from Fresh Harvest, including different officers and directors.  *See id.* ¶ 18.  Further, Fresh Foods does not commingle funds with Fresh Harvest.  *See id.* ¶ 19.  Fresh Foods maintains separate offices, facilities, and personnel from Fresh Foods.  *See id.* ¶ 14.  Fresh Foods further maintains a separate employee handbook and separate corporate policies from Fresh Harvest, and Fresh Foods has no input over Fresh Harvest's corporate polices, or *vice versa*.  *See id.* ¶¶ 14, 17.

It is undisputed that Sarmiento was hired by Fresh Foods on or about November 5, 2012 and was employed until January 29, 2020.  *See* Montes Decl., ECF No. 28-2 ¶ 3; Michalak Decl., ECF No. 139-3, Ex. A, Sarmiento Dep. Tr. 24:24–25:6.  Sarmiento worked as a domestic driver responsible for transporting Fresh Foods' produce.  *See* Montes Decl., ECF No. 28-2 ¶ 3.  Sarmiento's position required that he obtain a commercial driver's license.  *See id.*  Sarmiento submitted his employment application to Fresh Foods.  *See id.* ¶ 4.  During his employment, Fresh Foods exclusively and directly paid wages to Sarmiento.  *See id.* ¶ 5.  Further, Fresh Foods was listed as Sarmiento's employer on each of his federal W-2 forms.  *See id.* ¶ 6.  Fresh Foods also exclusively provided Sarmiento employee benefits, including health insurance.  *See id.* ¶ 6.

### 1.  Contracts between Fresh Foods and Fresh Harvest for H-2A Labor

From 2017 on, Fresh Harvest has entered into a series of agreements with Fresh Foods to provide foreign truck drivers through the H-2A program for harvesting Fresh Foods' crops.  *See* Ridaura Decl., ECF No. 28-2 ¶ 5; Chan Decl., ECF No. 126, Ex. H, Ridaura Dep. Tr. 115:2–19; *id.*, Exs. 56, 105–107, J.  Fresh Foods originally approached Fresh Harvest because it needed truck driving labor.  *See* Chan Decl., ECF No. 126, Ex. H, Ridaura Dep. Tr. 122:1–125:1.  Fresh Harvest provided Fresh Foods around seven to ten H-2A truck drivers each year between 2017 and 2020.  *See* Chan Decl., ECF No. 126, Ex. H, Ridaura Dep. Tr. 115:1–19.  Fresh Harvest submitted H-2A job order applications for the foreign truck drivers provided to Fresh Foods.  *See id.* 128:22–130:6.

---

[1] Given Fresh Foods, Inc.'s and Rava Ranches, Inc.'s close relationship, the Court generally refers to them collectively and interchangeably as "Fresh Foods" throughout this order.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Further, Fresh Foods signed an agreement indemnifying Fresh Harvest "against any and all claims,

2   liability, loss, expenses, suits, damages, judgments, demands, and costs (including reasonable legal

3   fees and expenses) arising out of the utilization and employment of H-2A Truck Drivers with any

4   governmental agency including, but not limited to: Department of Transportation." *See* Chan Decl.,

5   ECF No. 126, Ex. 52.  Fresh Harvest's dispatchers supervise Fresh Harvest's H-2A drivers.  *See*

6   Scaroni Decl., ECF No. 72-2 ¶ 5.

7          Fresh Harvest did not provide Sarmiento as a driver under the agreements with Fresh Foods.

8   *See* Ridaura Decl., ECF No. 28-2 ¶ 9.  Rather, Sarmiento was directly employed as a domestic driver

9   for Fresh Foods.  *See id.*; *see also* Opposition, ECF No. 125 at 4.

### 2. Similarity of Fresh Harvest H-2A Drivers' and Fresh Foods Domestic Drivers' Work

11         Sarmiento provides evidence that the H-2A drivers Fresh Harvest supplied (1) had the same

12  job title as the Fresh Foods domestic drivers; (2) drove between the same places; (3) hauled the

13  same products; and (4) filled out common paperwork, including some on a daily basis.  *See* Chan

14  Decl., ECF No. 126, Ex. B, Diaz Dep. Tr. 99:21–100:2, 58:6–19, 82:9–15, 88:8–12; *id.*, Ex. E,

15  Ramos Dep. Tr. 117:9–18.  Trucks were reassigned between Fresh Foods domestic drivers and Fresh

16  Harvest H-2A drivers. *See id.*, Ex. B, Diaz Dep. Tr. 118:23–119:3, 120:3–5; Decl. of Alejandro

17  Ashworth, ECF No. 128 ¶ 3, Ex. X.   For example, trucks that Sarmiento drove were reassigned to

18  H-2A drivers immediately after his termination.  *See id*.  Fresh Foods would have new foreign and

19  domestic drivers ride with an experienced driver for a few days to learn the route, and the

20  experienced driver could be a foreign or domestic driver.  *See* Chan Decl., ECF No. 126, Ex. B,

21  Diaz Dep. Tr. 101:2–7, 101:11–20; Sarmiento Decl., ECF No. 129 ¶ 3.  Fresh Harvest does not

22  contest this evidence, although it argues that much of this evidence is irrelevant.

### 3. Control of Fresh Harvest's H-2A Drivers' and Fresh Foods Domestic Drivers' Work

25         For purposes of this Motion, Fresh Harvest and Sarmiento's main disputes relate to the extent

26  of Fresh Harvest's control over the work of Fresh Foods domestic drivers like Sarmiento.

27         Fresh Harvest provides declarations from Fresh Foods corporate officer Ms. Rava and Fresh

28  Harvest corporate officer Ms. Ridaura, indicating Fresh Harvest's lack of control over Sarmiento.

7

Ms. Rava and Ms. Ridaura indicate a complete lack of control by Fresh Harvest over Sarmiento or Fresh Foods—including over day-to-day work; wages; hiring, firing, demotion, and promotion decisions; performance evaluation; training; tools or equipment, including trucks; drug testing; scheduling; rest and meal breaks; payroll; or driver assignments to driving routes.  *See generally* Rava Decl., ECF No. 28-2; Ridaura Decl., ECF No. 28-2.

In response, Sarmiento points to declarations from Sarmiento and Luevano-Vaca, as well as documents and deposition testimony from Fresh Harvest and Fresh Foods employees.  Sarmiento's evidence primarily relates to the following areas:

- Sarmiento points to evidence that trucks were regularly reassigned between Fresh Foods domestic drivers and Fresh Harvest H-2A drivers, including Sarmiento's trucks immediately after his termination on January 29, 2020.  *See* Chan Decl., ECF No. 126, Ex. B, Diaz Dep. Tr. 118:23–119:3; *id.*, Ex. 39; Ashworth Decl., ECF No. 128, Ex. X.  Sarmiento further points to evidence that dispatchers from Fresh Foods and Fresh Harvest could assign trucks.   *See* Chan Decl., ECF No. 126, 139:23–140:11.

- Sarmiento points to evidence that Fresh Harvest and Fresh Foods dispatchers communicated about scheduling and discipline for drivers, including through WhatsApp and text message from 2017 to 2020.  *See* Chan Decl., ECF No. 126, Ex. B, Diaz Dep. Tr. 22:13–20, 75:10–18, 27:12–28:2, 31:3–15, 73:21–25; *id.*, Ex. E, Ramos Dep. Tr. 44:1–17, 118:6–120:6; *id.*, Exs. 3, 117.

- Sarmiento points to evidence that Fresh Harvest harvest crew supervisors coordinated with Fresh Foods drivers so they would know when to pick up harvest loads, which influenced Fresh Foods domestic drivers' schedules, including during the time that Sarmiento was employed by Fresh Foods.  *See* Chan Decl., ECF No. 126, Ex. D, Rava Dep. Tr. 130:21–23; *id.*, Ex. E, Ramos Dep. Tr. 64:23–65:1, 67:5–24; Sarmiento Decl., ECF No. 129 ¶ 5.

- Sarmiento points to evidence of Fresh Harvest's assistance with recruitment and onboarding of domestic and H-2A workers in 2020 and with applications for H-2A

United States District Court
Northern District of California

drivers to be directly employed by Fresh Foods.  *See* Chan Decl., ECF No. 126, Ex. 66; *id.*, Ex. D, Rava Dep. Tr. 105:25–106:3, 107:15–108:5; *id.*, Ex. H, Ridaura Dep. Tr. 133:19–134:18; *id.*, Exs. 66, 109; *id.*, Ex. H, Ridaura Dep. Tr. 140:9–146:22; *id.*, Ex. D, Rava Dep. Tr. 41:13–16, 46:1–10, 52:22–25, 84:21–85:6, 92:9–16; *id.*, Exs. 40–42; *id.*, Ex. H, Ridaura Dep. Tr. 152:2–153:1; *id.*, Ex. D, Rava Dep. Tr. 117:10–20; *id.*, Ex. 68; *id.*, Ex. D, Rava Dep. Tr. 92:21–93:3; *see id.*, Ex. 44.

- Sarmiento points to evidence of coordination between Fresh Harvest and Fresh Foods regarding payroll for H-2A employees, including for employees directly employed by Fresh Foods.  *See id.*, Ex. W at 2; *id.*, Ex. I, Scaroni Dep. Tr. 107:11–15, 131:18–21; *id.*, Exs. 119–121; *id.*, Ex. 36; *id.*, Ex. O; *id.*, Ex. D, Rava Dep. Tr. 68:18–19, 69:24–70:6; *id.*, Ex. 35 at FFI004877; *id.*, Ex. 51 at FFI004846.

- Sarmiento points to evidence that Fresh Harvest and Fresh Foods both insured H-2A drivers.  *See id.*, Ex. I, Scaroni Dep. Tr. 191:25–192:2; *id.*, Ex. Q.

- Sarmiento points to evidence that Fresh Harvest and Fresh Foods formed the Farm Labor Association for Growers ("FLAG") in 2020, and they communicated about having Fresh Foods H-2A employees resign and start an employment contract with FLAG.  *See* Luevano-Vaca Decl., ECF No. 130 ¶ 7; Chan Decl., ECF No. 126, Exs. 38, 51, 113–16.

- Sarmiento points to representations Fresh Harvest has made, including before a DOL Administrative Law Judge, indicating that it considers itself to be a joint employer with its clients as to H-2A workers it provides.  *See* Chan Decl., ECF No. 126, Ex. 111 at FHI003186; *id.*, Ex. V.

- Sarmiento points to evidence that Luevano-Vaca did not understand there to be a difference between Fresh Harvest and Fresh Foods.  *See* Luevano-Vaca Decl., ECF No. 130 ¶¶ 5–7.

### 4.  Events Following Sarmiento's Termination from Fresh Foods

Sarmiento was terminated from Fresh Harvest on January 29, 2020.  *See* Montes Decl., ECF No. 28-2 ¶ 3.

United States District Court
Northern District of California

1

2

3

4

5

6

7

During March and April 2020, Fresh Foods went through the process of applying for and directly employing some H-2A truck drivers that had previously been provided by Fresh Harvest following the Department of Labor's rejection of Fresh Harvest's H-2A job orders.  *See* Opposition, ECF No. 125 at 7.  Fresh Harvest assisted with the preparation of this direct employment of H-2A employees, including by preparing employment contracts and a "return to work" letter, and sending HR personnel to assist with Fresh Foods' onboarding of H-2A drivers.  Chan Decl., ECF No. 126, Ex. D, Rava Dep. Tr, 92:21–93:3, 117:10–20; Exs. 44, 68; *see also* Reply, ECF No. 139 at 6–7.

8

9

10

11

12

13

Sarmiento also points to evidence that around April 2020, Fresh Harvest provided employment contracts to Fresh Foods for its H-2A and domestic employees.  *See id.*, Exs. 40–42; *id.*, Ex. H, Ridaura Dep. Tr. 152:2–153:1.  Additionally, Sarmiento points to evidence that Fresh Harvest drafted "return to work" letters for Fresh Foods domestic workers in 2020 and assisted with communicating with potential Fresh Foods domestic workers.  *See* Chan Decl., ECF No. 126, Ex. D, Rava Dep. Tr. 117:10–20; *id.*, Ex. 68; *id.*, Ex. D, Rava Dep. Tr. 92:21–93:3.

14

15

16

17

Around April 2020, Fresh Harvest and Fresh Foods formed the Farm Labor Association for Growers ("FLAG"), which formalized their joint employer relationship as to H-2A truck drivers.  *See* Chan Decl., ECF No. 126, Exs. 67, 71, 111; *id.*, Ex. D, Rava Dep. Tr. 61:3–62:25; *see also id.*, Exs. 38, 51, 113–116, 4876, 4878.

18

**C.**     **Summary Judgment Motion as to Luevano-Vaca's Claims**

19

20

21

22

23

24

Gustavo Luevano-Vaca was a truck driver for the company HarvesTek de Mexico in 2018.  *See* Luevano-Vaca Decl., ECF No. 130 ¶ 2.  In 2019 he was assigned to travel to the United States on a visa to drive trucks in the area of King City, CA for Fresh Harvest, which was affiliated with HarvesTek.  *See id.* ¶ 3.  In 2020, Fresh Harvest assigned him to drive for Fresh Foods.  *See id.* ¶¶ 6–7.  He continued to work for Fresh Harvest from May 18, 2020 until his termination on June 26, 2020.  *See* Ridaura Decl., ECF No. 72-2 ¶ 5; Luevano-Vaca Decl., ECF No. 130 ¶ 7.

25

26

27

28

Sarmiento filed this action on November 12, 2020.  *See* Complaint, ECF No. 1.  In December 2020, an individual in a HarvestTek vest visited Luevano-Vaca's house in Mexico, requesting that he call Fresh Harvest.  *See* Luevano-Vaca Decl., ECF No. 130 ¶ 8.  He met with Fresh Harvest corporate officer Ms. Ridaura at her office in Mexico on December 17, 2020, where she gave him a

United States District Court
Northern District of California

check and they scheduled a further appointment.  *See id.* ¶ 9.  Fresh Harvest representatives met with Gustavo Luevano-Vaca on December 31, 2020 to discuss the possibility of a settlement regarding his claims.  *See* Ridaura Decl., ECF No. 72-2 ¶¶ 7–8.  Fresh Harvest provided him with (1) a Disclosure Statement in English and Spanish that included discussion of this lawsuit and (2) a settlement agreement in English and Spanish.  *See id.*  In consideration for his executing the settlement agreement, Fresh Harvest provided him with a check for $2,618.35.  *See id.* ¶ 9.  Luevano-Vaca states that he did not know about Sarmiento's lawsuit, he did not have an attorney present, he did not understand the documents he signed, and he signed because he wanted to work for Fresh Harvest again and to receive the check.  *See* Luevano-Vaca Decl., ECF No. 130 ¶¶ 12–14.

In the Settlement Agreement, Luevano-Vaca agreed to settle "any and all claims arising out of [his] employment with [Fresh Harvest]."  Ridaura Decl., ECF No. 72-2, Ex. C § 1.

## II.    LEGAL STANDARD

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.*

The party moving for summary judgment bears the initial burden of informing the Court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial."  *House v. Bell*, 547 U.S. 518, 559–60 (2006).  Where the moving

United States District Court
Northern District of California

1    party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

2    reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless,*

3    *Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

4         If the moving party meets its initial burden, the burden shifts to the nonmoving party to

5    produce evidence supporting its claims or defenses. *Nissan Fire*, 210 F.3d at 1103. If the

6    nonmoving party does not produce evidence to show a genuine issue of material fact, the moving

7    party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. "The court must view the evidence

8    in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's

9    favor." *City of Pomona*, 750 F.3d at 1049 (citations omitted). "[T]he 'mere existence of a scintilla

10   of evidence in support of the [nonmovant's] position'" is insufficient to defeat a motion for summary

11   judgment. *Id.* (quoting *Anderson*, 477 U.S. at 252). "'Where the record taken as a whole could not

12   lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"

13   *Id.* at 1049–50 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

14   (1986)).

15   **III.    DISCUSSION**

16        **A.    Request for Judicial Notice**

17        Fresh Harvest filed a Request for Judicial Notice along with its Reply in support of its

18   summary judgment motions. *See* Request for Judicial Notice, ECF No. 139. Fresh Harvest seeks

19   judicial notice of two exhibits—both containing wage report information retrieved from the official

20   Department of Labor website. *See id.* Since Sarmiento does not oppose Fresh Harvest's request,

21   and since courts commonly find information published on government websites judicially

22   noticeable, the Court GRANTS Fresh Harvest's request for judicial notice as to Exhibits H and I to

23   the Request for Judicial Notice. *See, e.g., Estate of Fuller v. Maxfield & Oberton Holdings, LLC*,

24   906 F.Supp.2d 997, 1003–1004 (N.D. Cal. 2012) (citing *Daniels-Hall v. Nat'l Educ. Ass'n*,

25   629 F.3d 992, 998–99 (9th Cir. 2010)); *Eidmann v. Walgreen Co.*, 522 F.Supp.3d 634, 642 (N.D.

26   Cal. 2021).

27        **B.    Motion as to Luevano-Vaca**

28        Fresh Harvest moves for summary judgment against Luevano-Vaca, arguing that based on

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1    a settlement agreement he signed releasing any claims against Fresh Harvest when he was only a

2    putative class member to this action, the Court should find as a matter of law that he released his

3    claims against Fresh Harvest.  *See* Luevano-Vaca Motion, ECF No. 72-1 at 10–14.  Further, Fresh

4    Harvest argues that the Court should grant summary judgment on its breach of contract counterclaim

5    against Luevano-Vaca.  *See id.* at 14–16.  In response, Luevano-Vaca argues that the settlement

6    agreement is void under 29 C.F.R. § 501.5 of the H-2A regulations, which states that a person "may

7    not seek to have an H-2A worker . . . waive any rights" under the H-2A regulations, except for

8    limited circumstances, including when "in settlement of private litigation," which was not pending

9    between Luevano-Vaca and Fresh Harvest when they executed the settlement agreement.  29 C.F.R.

10   § 501.5; *see* Opposition, ECF No. 125 at 21–24.  Further, Luevano-Vaca argues that the settlement

11   agreement is invalid because it was procured through misleading statements and in coercive

12   circumstances.  *See id.* at 24–25.  On reply, Fresh Harvest argues that 29 C.F.R. § 501.5 cannot void

13   the settlement agreement, because this would mean a federal regulation preempts California

14   decisional and statutory law, including the *Pick Up Stix* case, indicating that employers can settle

15   wage and hour claims with employees that are putative class members to pending litigation.  *See*

16   Reply, ECF No. 139 at 13–14 (citing *Chindarah v. Pick Up Stix, Inc.*, 171 Cal.App.4th 796,

17   801–803 (2009)).

18        The Court found the settlement agreement between Luevano-Vaca and Fresh Harvest void

19   and granted Luevano-Vaca's motion to dismiss Fresh Harvest's counterclaim on December 1,

20   2021.[2]  *See* Order, ECF No. 147.  To the extent Fresh Harvest did not previously raise the preemption

21   argument in its briefing regarding Luevano-Vaca's motion to dismiss Fresh Harvest's counterclaim,

22   the Court finds that its order on the motion to dismiss resolved this issue as well.  *See id.* at 10–11.

23   The Court found that *Pick Up Stix* and its progeny was distinguishable from the present case.  *See*

24   *id.*  Accordingly, the Court does not agree with Fresh Harvest that 29 C.F.R. § 501.5 preempts

25

26   [2] The Court notes that it certified the following issue for interlocutory appeal regarding its order on
     Luevano-Vaca's motion to dismiss:  "Whether an agreement between a class action defendant
27   employer and an H-2A worker putative class member releasing all claims against the employer
     based on past conduct is permitted under 29 C.F.R. § 501.5(b) as "in settlement of private litigation."
28   *See* ECF No. 158 at 6.  Fresh Harvest has filed a petition to appeal this issue to the Ninth Circuit.
     *See* ECF No. 159.

1    California decisional or statutory law.

2         Based on the above reasoning and the reasoning in its order granting Luevano-Vaca's motion

3    to dismiss Fresh Harvest's counterclaim, the Court finds that Fresh Harvest's summary judgment

4    motion against Luevano-Vaca is MOOT.

5         **C.    Motion as to Sarmiento**

6              **1.   AWPA**

7         Fresh Harvest argues that the Court should grant summary judgment in its favor because it

8    is not a joint employer of Sarmiento along with Fresh Foods under the AWPA. *See* Sarmiento

9    Motion, ECF No. 28-1 at 7–9. Under the AWPA, an entity is considered a joint employer of a

10   worker based upon an evaluation "all the facts in the particular case." 29 C.F.R. § 500.20(h)(5). "If

11   the facts establish that two or more persons are completely disassociated with respect to the

12   employment of a particular employee, a joint employment situation does not exist." *Id.* Courts

13   generally consider the factors laid out in 29 C.F.R. § 500.20(h)(5)(iv)(A) through (G), which the

14   regulation states "are not to be applied as a checklist." *Id.* at § 500.20(h)(5)(iv). Further, the

15   regulation states that "[n]o one factor will be dispositive of the ultimate question; nor must a

16   majority or particular combination of factors be found for an employment relationship to exist." *Id.*

17   Additionally, the regulation states that these factors "are illustrative only and are not intended to be

18   exhaustive; other factors may be significant and, if so, should be considered, depending upon the

19   specific circumstances of the relationship among the parties." *Id.* "How the factors are weighed

20   depends upon all of the facts and circumstances." *Id.*

21        The factors provided by 29 C.F.R. § 500.20(h)(5)(iv) are the following:

22

23            (A) Whether the agricultural employer/association has the power,
              either alone or through control of the farm labor contractor to direct,
24            control, or supervise the worker(s) or the work performed (such
              control may be either direct or indirect, taking into account the nature
25            of the work performed and a reasonable degree of contract
              performance oversight and coordination with third parties);

26            (B) Whether the agricultural employer/association has the power,
27            either alone or in addition to another employer, directly or indirectly,
              to hire or fire, modify the employment conditions, or determine the
28            pay rates or the methods of wage payment for the worker(s);

United States District Court
Northern District of California

(C) The degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue;

(D) The extent to which the services rendered by the worker(s) are repetitive, rote tasks requiring skills which are acquired with relatively little training;

(E) Whether the activities performed by the worker(s) are an integral part of the overall business operation of the agricultural employer/association;

(F) Whether the work is performed on the agricultural employer/association's premises, rather than on premises owned or controlled by another business entity; and

(G) Whether the agricultural employer/association undertakes responsibilities in relation to the worker(s) which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

*Id.* at 500.20(h)(5)(iv)(A)–(G). Courts also consider certain "non-regulatory" factors. *See Torres-Lopez v. May*, 111 F.3d 633, 640, 642 (9th Cir. 1997). These include the following:

(1) whether the work was a "specialty job on the production line;

(2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;

(3) whether the premises and equipment of the employer are used for the work;

(4) whether the employees had a business organization that could or did shift as a unit from one worksite to another;

(5) whether the work was piecework and not work that required initiative, judgment or foresight;

(6) whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;

(7) whether there was permanence in the working relationship;

(8) whether the service rendered is an integral part of the alleged employer's business.

*See id.* at 640 (citations, quotation marks, and modifications omitted).

Fresh Harvest argues that the evidence does not support the existence of an employment

15

United States District Court
Northern District of California

relationship between Fresh Harvest and Sarmiento under the AWPA based on the regulatory and non-regulatory factors. *See* Sarmiento Motion, ECF No. 28-1 at 7–9.  In response, Sarmiento argues that there are material disputes of fact as to whether Fresh Harvest and Fresh Foods are joint employers under the AWPA.  *See* Opposition, ECF No. 125 at 17–21; *see also id.* at 6–10.  The Court will consider the regulatory and non-regulatory factors in turn.

a.   Power to Direct, Control, or Supervise

The first AWPA regulatory factor considers "[w]hether the agricultural employer/association has the power, either alone or through control of the farm labor contractor to direct, control, or supervise the worker(s) or the work performed[.]" 29 C.F.R. § 500.20(h)(5)(iv)(A).

Fresh Harvest argues that it had no power to direct, control, or supervise Sarmiento because Fresh Harvest could not (1) fire Sarmiento; (2) promote or demote Sarmiento; (3) transfer or remove Sarmiento to or from a driving route; (4) discipline Sarmiento; (5) supervise Sarmiento; (6) reward Sarmiento; (7) act on any grievance that Sarmiento made; (8) direct Sarmiento how to transport produce; (9) direct Sarmiento how to fill out reports regarding deliveries; or (10) train Sarmiento. *See* Ridaura Decl. ¶¶ 10–12.  Fresh Foods corporate officer Ms. Rava indicates that (1) Fresh Foods retained the authority to transfer or remove Sarmiento from a driving route; (2) Fresh Harvest could not require Sarmiento to submit to drug testing; (3) Fresh Harvest could not set Sarmiento's work schedule; (4) Fresh Harvest could not transfer, promote, discipline, or prevent Sarmiento from performing work as a driver for Fresh Foods; (5) Fresh Harvest could not review Sarmiento's work or tell him what specific work to perform or when to perform it; (6) Fresh Harvest could not instruct Sarmiento when and where to take meal and rest breaks; (7) a Fresh Foods employee supervised Sarmiento; (8) Fresh Harvest could not direct or control the job performance of Fresh Foods employees.  *See* Rava Decl., ECF No. 28-2 ¶¶ 10–13.

In response, Sarmiento disputes Fresh Foods officer Ms. Rava's statement that Fresh Harvest could not tell any Fresh Foods or Rava employees what specific work to perform or when to perform it, arguing that Fresh Harvest and Fresh Foods dispatchers worked closely together to direct the work of domestic and H-2A drivers.  *See* Opposition, ECF No. 125 at 19.  Sarmiento provides

evidence that (1) Fresh Harvest and Fresh Foods dispatchers would communicate daily about scheduling, *see* Chan Decl., ECF No. 126, Ex. B, Diaz Dep. Tr. 75:10–18, 27:12–28:2, 31:3–15, 73:21–25; *id.*, Ex. E, Ramos Dep. Tr. 118:6–120:6; *id.*, Ex. 3; (2) Fresh Harvest dispatcher Mr. Ramos messaged directly with Fresh Foods employees, *see id.*, Ex. E, Ramos Dep. Tr. 44:1–17; (3) Fresh Harvest's harvest crew supervisors determined the start times for all truck drivers, because harvest crew start times determine truck driver start times, *see id.*, Ex. D, Rava Dep. Tr. 130:21–23; *id.*, Ex. E, Ramos Dep. Tr. 64:23–65:1; Sarmiento Decl., ECF No. 129 ¶ 5; (4) Fresh Harvest supervisors sent a disciplinary notice regarding an H-2A employee to a Fresh Foods supervisor in 2019, *see id.*, Ex. 117; (5) Fresh Harvest and Fresh Foods supervisors shared the ability to assign trucks, including Sarmiento's trucks, one of which was reassigned to an H-2A employee immediately after his termination, *see id.*, Ex. E, Ramos Dep. Tr. 139:23–140:11; *id.*, Ex. B, Diaz Dep. Tr. 118:23–119:3, 120:3–5; *id.*, Ex. 39; Ashworth Decl., ECF No. 128, Ex. X; (6) Fresh Harvest crew supervisors directed truck driver work, *see* Chan Decl., ECF No. 126, Ex. E, Ramos Dep. Tr. 67:5–24; and (7) domestic and H-2A drivers received identical training, which involved riding along with a more experienced driver, *see id.*, Ex. B, Diaz Dep. Tr. 101:2–7, 101:11–20; Sarmiento Decl., ECF No. 129 ¶ 3.  Sarmiento argues that the evidence shows that Fresh Harvest had the power to directly or indirectly control, direct, or supervise Sarmiento.  *See* Opposition, ECF No. 125 at 19.

Based on the evidence presented by Sarmiento, the Court concludes that there are disputed issues of material fact that relate specifically to the regulatory factors which a reasonable jury must resolve in order to determine joint employment.  At least evidence regarding joint training, supervision, and scheduling is disputed.  *See, e.g., Torres-Lopez v. May*, 111 F.3d 633, 642 (9th Cir. 1997) (finding joint employer relationship where defendant "controlled the overall harvest schedule"); *Lemus v. Timberland Apts., LLC*, No. 3:10–cv–01071–PK, 2011 WL 7069078, **10–11 (D. Or. Dec. 21, 2011) ("Even though [defendant] did not directly dictate . . . work schedules or conditions of employment, various aspects of its management and supervision indirectly had a similar effect."); *see also* 29 C.F.R. § 500.20(h)(4)(ii) (supervision relevant to regulatory factor can be either "direct or indirect").  Although some of Sarmiento's evidence relates to a time period after

his termination, there is insufficient evidence in this record demonstrating that those practices only commenced after Sarmiento's termination.  Thus, a reasonable jury could infer that those practices were in effect during Sarmiento's employment.

> b. Power to Hire or Fire, Modify Employment Conditions, or Determine Pay Rates or Methods of Wage Payment

The second AWPA factor considers "[w]hether the agricultural employer/association has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the worker(s)[.]"  29 C.F.R. § 500.20(h)(5)(iv)(B).

For this factor, Fresh Harvest points to similar evidence that it pointed to for the first factor—various representations in the declarations of Fresh Foods corporate officer Ms. Rava and Fresh Harvest corporate officer Ms. Ridaura about Fresh Foods' power and Fresh Harvest's lack of power over Sarmiento.  *See* Sarmiento Motion, ECF No. 28-1 at 8 (citing Ridaura Decl., ECF No. 28-2 ¶¶ 9–11; Rava Decl., ECF No. 28-2 ¶ 9).  For example, Fresh Harvest officer Ms. Ridaura states that Fresh Harvest did not and could not (1) hire or participate in the hiring of Sarmiento as a domestic driver and direct employee of Fresh Foods; (2) fire Sarmiento; (3) act on any grievance Sarmiento made; (4) determine the manner and rate of pay for Sarmiento; (5) pay any wages or other compensation to Sarmiento; or (6) provide Sarmiento with any employee benefits, such as health insurance benefits.  *See* Ridaura Decl., ECF No. 28-2 ¶¶ 9–11.  Fresh Foods corporate officer Ms. Rava states that (1) Fresh Harvest did not hire, fire, promote, demote, train, or discipline Sarmiento; (2) Fresh Harvest did not set or pay compensation to Sarmiento; (3) Fresh Harvest was not responsible for evaluating or reviewing Sarmiento's performance; and (4) Fresh Harvest did not provide Sarmiento with any tools or equipment to carry out his work as a driver.  *See* Rava Decl., ECF No. 28-2 ¶ 9.

In response, Sarmiento points to documents and testimony from the depositions of Fresh Harvest officer Ms. Ridaura and Fresh Foods officer Ms. Rava that purportedly support Fresh Harvest's authority to hire, fire, establish employment conditions, and set wages for domestic and foreign workers employed by Fresh Foods.  *See* Opposition, ECF No. 125 at 7–9.  First, Sarmiento

points to evidence indicating that in March 2020, DOL denied Fresh Harvest's H-2A application, so Fresh Foods stepped in as an "emergency applicant" to apply for and directly employ H-2A workers.  *See* Chan Decl., ECF No. 126, Ex. 66; *id.*, Ex. D, Rava Dep. Tr. 105:25–106:3, 107:15–108:5; *id.*, Ex. H, Ridaura Dep. Tr. 133:19–134:18.  Sarmiento provides evidence that throughout this process, Fresh Harvest drafted the job order, which contained the material terms and conditions of truck driver employment, including wage rates.  *See id.*, Exs. 66, 109; *id.*, Ex. H, Ridaura Dep. Tr. 140:9–146:22; *id.*, Ex. D, Rava Dep. Tr. 41:13–16, 46:1–10, 52:22–25, 84:21–85:6, 92:9–16.  Second, Sarmiento points to evidence that in April 2020, Fresh Harvest sent employment contracts to Fresh Foods and indicated that Fresh Foods should have both H-2A and domestic employees sign them.  *See id.*, Exs. 40–42; *id.*, Ex. H, Ridaura Dep. Tr. 152:2–153:1.  Third, Sarmiento points to evidence that Fresh Harvest helped Fresh Foods with recruitment of domestic drivers in 2020, including by drafting "return to work" letters for Fresh Foods domestic workers in 2020.  *See* Chan Decl., ECF No. 126, Ex. D, Rava Dep. Tr. 117:10–20; *id.*, Ex. 68.  Sarmiento also points to evidence that Fresh Foods forwarded emails from potential domestic workers to Fresh Harvest in 2020.  *See id.*, Ex. D, Rava Dep. Tr. 92:21–93:3.  Additionally, Fresh Harvest sent HR representatives to help Fresh Foods with onboarding of new H-2A drivers directly employed by Fresh Foods. *See id.*, Ex. 44.  Fourth, Sarmiento points to evidence that Fresh Harvest communicated with Fresh Foods during April and May 2020 regarding the termination of several H-2A employees directly employed by Fresh Foods, who were being transferred over to FLAG, the association between Fresh Foods and Fresh Harvest for jointly employing H-2A workers.  *See* Luevano-Vaca Decl., ECF No. 130 ¶ 7; Chan Decl., ECF No. 126, Exs. 38, 51, 113–16.  Fifth, Sarmiento points to evidence that Fresh Harvest set wage rates for Fresh Foods domestic employees by setting wage rates in the job orders for H-2A workers provided to Fresh Foods in 2018, who were in "corresponding employment" with Fresh Foods domestic employees under the H-2A regulations. *See id.*, Ex. D, Rava Dep. Tr. 41:13–16.

The Court agrees with Sarmiento regarding the evidence that Fresh Harvest provided Fresh Foods with employment contracts for H-2A and domestic employees to sign.  Even though this evidence is from April 2020—around two months after Sarmiento's termination from Fresh

19

Foods—a reasonable juror could conclude from this evidence that Fresh Harvest had the power to modify Sarmiento's employment conditions or determine his rate of pay or method of payment during the course of his employment.  Fresh Harvest does not address this evidence specifically, instead generally arguing that Sarmiento's evidence pertains to conduct after Sarmiento's employment.  *See* Reply, ECF No. 139 at 6–7.  Sarmiento's evidence suggests that Fresh Harvest exercised significant power over Fresh Foods' employment practices only months after Sarmiento's employment.  A reasonable juror could conclude that Fresh Harvest's 2020 conduct did not come out of nowhere, and that it started before Sarmiento was terminated from Fresh Foods.  While Fresh Harvest provides declarations from its officers indicating that it did not and could not modify various aspects of Sarmiento's employment conditions during his employment, *see* Ridaura Decl., ECF No. 28-2 ¶¶ 9–11; Rava Decl., ECF No. 28-2 ¶ 9, Sarmiento's evidence indicates that there is a genuine dispute of material fact as to whether Fresh Harvest had the power to modify Sarmiento's employment conditions.

The Court makes a similar conclusion regarding the evidence that Fresh Harvest helped Fresh Foods with recruitment and onboarding of Fresh Foods' direct employees in 2020.  Fresh Harvest argues that the evidence that it provided a "return to work" letter for Fresh Foods domestic workers "does not prove Fresh Harvest had any control over recruitment or hiring of domestic workers and, in any event, it certainly does not establish control over Sarmiento, since it occurred after he was already gone."  Reply, ECF No. 139 at 6.  Sarmiento's evidence may not "prove" or "establish" Fresh Harvest's role in Fresh Foods' recruitment or hiring process—but that is not what Sarmiento needs to show in opposing Fresh Harvest's summary judgment motion.  The question is whether a reasonable juror could conclude from the evidence that Fresh Harvest had power over Fresh Foods' hiring or recruitment process during Sarmiento's employment, and the Court finds a juror could draw that conclusion.

Further, the Court finds that a reasonable juror could conclude that Fresh Harvest had the power to set wage rates for Sarmiento.  Sarmiento provides evidence that Fresh Harvest had the power to set wage rates for H-2A employees provided to Fresh Foods.  *See id.*, Ex. D, Rava Dep. Tr. 41:13–16.  Sarmiento argues that this means Fresh Harvest had the power to set wage rates for

United States District Court
Northern District of California

Sarmiento, since he was in "corresponding employment" with the H-2A employees.  Since the Court finds below that there is a genuine issue of material fact as to whether Sarmiento was in "corresponding employment" with the Fresh Harvest H-2A workers and whether this meant that a direct contractual relationship existed between Fresh Harvest and Sarmiento, the Court finds that a reasonable juror could conclude that Fresh Harvest had the power to set wage rates for Sarmiento.

Although other portions of Sarmiento's evidence may not cause disputed factual issues, considering the evidence in its totality, the Court finds that there are genuine issues of material fact as to whether Fresh Harvest had the power to hire or fire, modify employment conditions, or determine pay rates or methods of wage payment for Sarmiento.  Accordingly, viewing the evidence in the light most favorable to Sarmiento, the Court finds that the second AWPA regulatory factor supports the existence of a joint employer relationship between Fresh Harvest and Fresh Foods as to Sarmiento.

c.  Degree of Permanency and Duration of the Relationship of the Parties

The third AWPA factor considers "[t]he degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue[.]" 29 C.F.R. § 500.20(h)(5)(iv)(C).

Fresh Harvest argues that since Sarmiento was employed by Fresh Foods, he had no relationship with Fresh Harvest, so there is no relationship for which degree of permanency or duration can be considered.  *See* Sarmiento Motion, ECF No. 28-1 at 8.  In response, Sarmiento argues that Fresh Harvest has been providing H-2A truck driving labor to Fresh Foods since 2017, and the companies have admitted to jointly employing H-2A drivers.  *See* Opposition, ECF No. 125 at 20; *see also id.* at 9–10.  On reply, Fresh Harvest argues this relationship between Fresh Harvest and Fresh Foods was brief, and it only pertained to H-2A drivers—not domestic drivers like Sarmiento.  *See* Reply, ECF No. 139 at 8.

The Court agrees with Sarmiento.  Even if Sarmiento's relationship with Fresh Harvest was not a formal employment relationship, a reasonable juror could conclude from the evidence that he had a relationship with Fresh Harvest that lasted several years, including by working closely with Fresh Harvest supervisors and drivers.  *See, e.g.*, Michalak Decl., ECF No. 139-3, Ex. C, Ramos

Dep. Tr. 67:20–24 (indicating communication between drivers and Fresh Harvest supervisors); Chan Decl., ECF No. 126, Ex. H, Ridaura Dep. Tr. 115:1–19 (Fresh Harvest was involved with Fresh Foods starting in 2017).

Accordingly, the Court finds that there is a genuine dispute of material fact as to whether the degree of permanency and duration of the relationship between the parties indicates the existence of a joint employment relationship between Fresh Harvest and Fresh Foods as to Sarmiento.

### d. Level of Skill Involved

The fourth AWPA factor considers "[t]he extent to which the services rendered by the worker(s) are repetitive, rote tasks requiring skills which are acquired with relatively little training[.]" 29 C.F.R. § 500.20(h)(5)(iv)(D).

Fresh Harvest concedes that while Sarmiento's position required a commercial driver's license and therefore required special skill, this factor should be given minimal weight. *See* Sarmiento Motion, ECF No. 28-1 at 8. Sarmiento does not address this factor in his Opposition. *See* Opposition, ECF No. 125.

It is undisputed that the commercial driver's license requirement indicates that truck driving involves significant skill.

### e. Integral Part of Overall Business Operation

The fifth AWPA factor considers "[w]hether the activities performed by the worker(s) are an integral part of the overall business operation of the agricultural employer/association[.]" 29 C.F.R. § 500.20(h)(5)(iv)(E).

Fresh Harvest argues that this factor supports a lack of an employment relationship between Fresh Harvest and Sarmiento because even though driving is an aspect of Fresh Harvest's business, Sarmiento drove for Fresh Foods—not for Fresh Harvest. *See* Sarmiento Motion, ECF No. 28-1 at 9. Sarmiento does not address this factor in his Opposition. *See* Opposition, ECF No. 125.

The Court agrees with Fresh Harvest. Sarmiento provides no evidence indicating that the directly employed drivers of Fresh Harvest's clients, like Fresh Foods, are an integral part of Fresh Harvest's overall business.

Accordingly, there are no disputed issues on this factor.

22

f.   Work Location

The sixth AWPA factor considers "[w]hether the work is performed on the agricultural employer/association's premises, rather than on premises owned or controlled by another business entity[.]"  29 C.F.R. § 500.20(h)(5)(iv)(G).

Fresh Harvest argues that this factor supports the lack of an employment relationship between Fresh Harvest and Sarmiento because the evidence shows that to the extent Sarmiento's work took place on any specific premises, it took place on Fresh Foods' premises—not Fresh Harvest's.  *See* Sarmiento Motion, ECF No. 28-1 at 9.  Sarmiento does not address this factor in his Opposition. *See* Opposition, ECF No. 125.

The Court agrees with Fresh Harvest that this factor is undisputed.

g.   Responsibilities Commonly Performed by Employers

The seventh AWPA regulatory factor considers the following:

> Whether the agricultural employer/association undertakes responsibilities in relation to the worker(s) which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

29 C.F.R. § 500.20(h)(5)(iv)(G).

Fresh Harvest argues that this factor weighs against an employment relationship between Fresh Harvest and Sarmiento, because the evidence indicates that Fresh Harvest was solely responsible for issuing Sarmiento's paychecks and was the sole employer listed on Sarmiento's wage statements.  *See* Sarmiento Motion, ECF No. 28-1 at 9 (citing Montes Decl., ECF No. 28-2, Ex. C); *id.* at 2 (citing Rava Decl. ¶ 14).

In response, Sarmiento points to evidence that (1) a Fresh Harvest dispatcher directed H-2A drivers to use the Rava time clock, *see* Chan Decl., ECF No. 126, Ex. W at 2; (2) Fresh Harvest collected H-2A employee payroll documents using boxes labeled for Fresh Foods, *see id.*, Ex. I, Scaroni Dep. Tr. 107:11–15, 131:18–21; *id.*, Exs. 119–121; (3) Fresh Harvest tracked Fresh Foods' direct employees' time and sent time reports to Fresh Foods, *see id.*, Ex. 36; (4) Fresh Harvest

1    prepared "payroll stuffer[s]" for Fresh Foods' pay statements, *see id.*, Ex. O; (5) Fresh Harvest and

2    Fresh Foods coordinated H-2A worker employee numbers so they would appear the same on either

3    company's payroll, *see id.*, Ex. D, Rava Dep. Tr. 68:18–19, 69:24–70:6; *id.*, Ex. 35 at FFI004877;

4    *id.*, Ex. 51 at FFI004846; and (6) Fresh Harvest placed H-2A drivers on its insurance policy, *id.*,

5    Ex. I, Scaroni Dep. Tr. 191:25–192:2; *id.*, Ex. Q.

6        On reply, Fresh Harvest argues that Sarmiento's evidence only relates to H-2A workers

7    during the period after Sarmiento was terminated in January 2020, so it has no bearing on

8    Sarmiento's relationship with Fresh Harvest. *See* Reply, ECF No. 139 at 3–4. Further, Fresh

9    Harvest provides evidence that Fresh Foods has a separate payroll system from Fresh Harvest. *See*

10   Michalak Decl., ECF No. 139-3, Ex. E, Rava Dep. Tr. 64:6–7; *id.*, Ex. A, Sarmiento Dep. Tr.

11   108:14–19, 113:12–17.

12       The Court finds that there is a genuine dispute of material fact whether Fresh Harvest's

13   conduct toward Fresh Foods direct employees mere months after Sarmiento's termination from

14   Fresh Foods supports the existence of an employer-employee relationship between Fresh Harvest

15   and Sarmiento. Viewing the evidence in the light most favorable to Sarmiento, the Court finds that

16   Fresh Harvest undertook some responsibilities commonly performed by employers as to Fresh

17   Foods direct employees, including by tracking Fresh Harvest employee time. *See City of Pomona*,

18   750 F.3d at 1049.

19           h.   Non-Regulatory Factors

20       Various "non-regulatory factors" can enter into the determination of whether there is a joint

21   employment relationship under the AWPA. *See Torres-Lopez*, 111 F.3d at 642. Fresh Harvest

22   argues that the non-regulatory factors are irrelevant to this case. *See* Sarmiento Motion,

23   ECF No. 28-1 at 9. Sarmiento fails to address the non-regulatory factors at all. See Opposition,

24   ECF No. 125. The Court agrees with Fresh Harvest. The non-regulatory factors either overlap with

25   the regulatory factors the Court has already analyzed or are irrelevant to the present case.

26   Accordingly, the Court declines to analyze the non-regulatory factors here.

27                                    * * *

28       Based on the above reasoning, the Court finds that in assessing the AWPA factors, a

United States District Court
Northern District of California

1   reasonable trier of fact could find that a joint employer relationship existed between Fresh Harvest

2   and Fresh Foods as to Sarmiento.  *See Soremekun*, 509 F.3d at 984.  There are genuine disputes of

3   material fact as to whether Fresh Harvest had the power to direct, control, or supervise Sarmiento;

4   whether Fresh Harvest had the power to hire or fire, modify the employment conditions, or

5   determine pay rates or methods of wage payment as to Sarmiento; whether the duration of the

6   relationship between Fresh Harvest, Fresh Foods, and Sarmiento supports the existence of a joint

7   employment relationship; and whether Fresh Harvest had responsibilities as to Sarmiento commonly

8   performed by an employer.

9          Accordingly, the Court DENIES Fresh Harvest's summary judgment motion as to

10  Sarmiento's AWPA claim.  29 C.F.R. § 500.20(h)(5)(iv) ("No one factor will be dispositive of the

11  ultimate question; nor must a majority or particular combination of factors be found for an

12  employment relationship to exist.");  *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754

13  (9th Cir. 1979).

14              **2.   California Labor Code**

15         Fresh Harvest argues that the Court should grant summary judgment in its favor regarding

16  Sarmiento's California wage-related claims because Fresh Harvest is not Sarmiento's "employer"

17  under California law.  *See* Sarmiento Motion, ECF No. 28-1 at 5–7.   Under California law, "an

18  employment relationship must exist in order for the California wage orders or the provisions of the

19  Labor Code governing wages ... to be applicable." *Post v. Palo/Haklar Associates*, 23 Cal.4th 942,

20  947 (2000) (citing 1 Wilcox, Cal. Employment Law § 1.04[1][a], pp. 1–9 (2000)).  Corporate entities

21  are presumed to have separate existences, and there is a strong presumption that a parent company

22  is not the employer of its subsidiary's employees.   *Laird v. Capital Cities/ABC, Inc.*,

23  68 Cal.App.4th 727, 737 (1998) (citing *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir.

24  1993)).  Further, "there is a rebuttable presumption that 'employer,' . . . includes any person or entity

25  identified as the employer on the employee's Federal Form W-2 (Wage and Tax Statement)."

26  Cal. Gov't Code § 12928.  The California Industrial Welfare Commission ("IWC") has provided a

27  test to establish joint employers under California law.  *See Martinez v. Combs*, 49 Cal.4th 35, 64

28  (2010).  In *Martinez*, the California Supreme Court held that "to employ," as used in California

1

2

3

wage orders, means "(a) to exercise control over the wages, hours or working conditions, or (b) to suffer or permit to work, or (c) to engage, thereby creating a common law employment relationship." *Id.*

4

5

6

7

8

9

10

11

12

Citing the same evidence from the declarations of Fresh Harvest officer Ms. Ridaura and Fresh Foods corporate officer Ms. Rava it cites under the AWPA, Fresh Harvest argues that Fresh Harvest was not Sarmiento's "employer." *See* Sarmiento Motion, ECF No. 28-1 at 5–7. In response, Sarmiento incorporates his briefing in support of his AWPA-related arguments and cites California caselaw to argue that (1) the "employer" standard under California law affords greater protection than the federal standard; (2) an employer's power over *other* employees is evidence of an employer's power over a particular employee; and (3) a finding of control can be based on a worker's reasonable belief that two companies were joint employers. *See* Opposition, ECF No. 125 at 20–21.

13

14

       a.  *Martinez* Factor #1:  "To Exercise Control Over the Wages, Hours or Working Conditions"

15

16

17

18

19

20

21

22

23

24

25

26

Under the first *Martinez* factor, Fresh Harvest points to evidence that it could not (1) determine the manner and rate of pay for Sarmiento; (2) pay Sarmiento wages or other compensation; (3) provide Sarmiento with any employee benefits; (4) hire or fire Sarmiento; (5) promote or demote Sarmiento; (5) transfer or remove Sarmiento from a specific driving route; (6) discipline Sarmiento; (7) act upon any grievance that Sarmiento made; (8) train Sarmiento on how to perform his job duties; (8) instruct Sarmiento when and where to take meal and rest breaks; (9) evaluate or review Sarmiento's work performance; or (10) provide Sarmiento with any tools or equipment to carry out his work. *See* Ridaura Decl., ECF No. 28-2 ¶ 10–11. Further, Fresh Harvest points to evidence that Fresh Foods was listed as the sole employer on Sarmiento's paystubs and W-2s; it was solely responsible for supervising Sarmiento's work as a driver; and it did not provide Sarmiento with its employee handbooks or policies and procedures and did not have access to Sarmiento's employment records. *See* Montes Decl., ECF No. 28-2, Exs. C & D; Ridaura Decl., ECF No. 28-2 ¶¶ 13, 15; Rava Decl., ECF No. 28-2 ¶ 10.

27

28

Under the first *Martinez* factor, there is a genuine dispute of material fact as to whether Fresh

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Harvest had the power "to exercise control over the wages, hours or working conditions" of Fresh

2  Foods domestic workers like Sarmiento. *Martinez*, 49 Cal.4th at 64. For example, the Court found

3  that there are disputes of material fact as to whether Fresh Harvest could exercise control over

4  various aspects of Sarmiento's job, including whether (1) Fresh Harvest supervisors indirectly

5  impacted the schedules of Fresh Foods employees and directly coordinated with them about picking

6  up harvest loads; (2) Fresh Harvest supervisors distributed work schedules for Fresh Foods

7  employees; (3) Fresh Harvest supervisors could assign trucks to Fresh Foods direct employees; (4)

8  Fresh Harvest had the power to determine or change the terms of Sarmiento's employment contract;

9  (5) Fresh Harvest had the power to hire Sarmiento; and (6) Fresh Harvest had the power to determine

10 Sarmiento's wage rate.

11      Accordingly, viewing the evidence in the light most favorable to Sarmiento, the Court finds

12 that the first *Martinez* factor favors a finding that Fresh Harvest was Sarmiento's "employer" under

13 California law.

14          b.   *Martinez* Factor #2: "To Suffer or Permit to Work"

15      Under the second *Martinez* factor, the question is whether Fresh Harvest "had the power to

16 prevent [Sarmiento] from working." *Martinez*, 49 Cal.4th at 70. The Court finds that there is no

17 genuine dispute of material fact that Fresh Harvest did not have the power to prevent Sarmiento

18 from working. Fresh Harvest presents evidence that Fresh Harvest could not and did not terminate

19 Sarmiento. *See* Ridaura Decl., ECF No. 28-2 ¶¶ 9–11; Rava Decl., ECF No. 28-2 ¶ 9. In response,

20 Sarmiento provides evidence that Fresh Harvest communicated with Fresh Foods about the

21 termination of Fresh Foods H-2A employees in 2020 prior to the employees' contracting with

22 FLAG. *See* Luevano-Vaca Decl., ECF No. 130 ¶ 7; Chan Decl., ECF No. 126, Exs. 38, 51, 113–16.

23 This evidence would not be sufficient for a reasonable juror to find that Fresh Harvest had the power

24 to fire Sarmiento.

25      There does not appear to be disputed evidence on this factor, but this, alone, is insufficient

26 to defeat the claim of joint employer status.

27          c.   *Martinez* Factor #3: "To Engage"

28      Under the third *Martinez* factor, the question is whether Fresh Harvest created a common

27

law employment relationship with Sarmiento. *Martinez*, 49 Cal.4th at 64. Fresh Harvest primarily argues that it "did not and could not hire or fire [Sarmiento], pay his wages, supervise his work, or instruct him on how to complete his work for Fresh Foods" in support of its contention that this *Martinez* factor does not indicate that it employed Sarmiento. *See* Sarmiento Motion, ECF No. 28-1 at 7.

But the Court has found there to be genuine issues of material fact as to some of Fresh Harvest's contentions about its lack of power over Sarmiento. For example, a reasonable juror could find based on the evidence that Fresh Harvest supervisors indirectly impacted Fresh Foods' direct employees work schedules and directly coordinated with Fresh Foods direct employees that Fresh Harvest could "supervise his work, or instruct him on how to complete his work for Fresh Foods." *See* Chan Decl., ECF No. 126, Ex. D, Rava Dep. Tr. 130:21–23; *id.*, Ex. E, Ramos Dep. Tr. 64:23–65:1; Sarmiento Decl., ECF No. 129 ¶ 5; *see* Michalak Decl., ECF No. 139-3, Ex. C, Ramos Dep. Tr. 67:20–24. Indeed, courts consider the alleged employer's supervision over the alleged employee in determining whether a common law employment relationship exists. *See Curry v. Equilon Enterps., LLC*, 23 Cal.App.5th 289, 305 (2018).

Considering the totality of the evidence, the Court finds that there is disputed evidence on at least some aspects of the third *Martinez* factor.

\* \* \*

Based on the above reasoning, the Court finds that there is a genuine dispute of material fact as to whether Fresh Harvest was an "employer" of Sarmiento under California law. The Court's conclusion is further supported by Sarmiento's caselaw indicating that the California Labor Code affords greater protection to employees than the federal standard. *See Guerrero v. Sup. Ct.*, 213 Cal.App.4th 912, 945–46 (2013) (citing the "narrower federal standard" of "employer"); *Carrillo v. Schneider Logistics Trans-Loading and Dist., Inc.*, No. 2:11–cv–8557–CAS (DTBx), 2014 WL 183956, at \*15 n.5 (C.D. Cal. Jan. 14, 2014) ("a finding of genuine factual disputes underlying the FLSA joint employer analysis would support the same finding under California law"). Therefore, the Court DENIES Fresh Harvest's summary judgment motion as to Sarmiento's California Labor Code claims.

### 3. Breach of Contract

Fresh Harvest argues that Sarmiento's breach of contract fails as a matter of law because he cannot establish that an employment contract existed between Fresh Harvest and Sarmiento. *See* Sarmiento Motion, ECF No. 28-1 at 10. In response, Sarmiento argues that (1) Sarmiento was a direct party to a contract with Fresh Harvest because he worked in "corresponding employment" to H-2A workers employed by Fresh Harvest and (2) Sarmiento was an intended third-party beneficiary of Fresh Harvest's H-2A job order contracts with Fresh Foods. Opposition, ECF No. 125 at 14–16. The Court will consider each argument in turn.

#### a. Direct Contractual Relationship

Fresh Harvest seeks summary judgment regarding Sarmiento's claim that Fresh Harvest breached an employment contract to which Sarmiento was a direct party. *See* Sarmiento Motion, ECF No. 28-1 at 10; Reply, ECF No. 139 at 10–11. "[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 821 (2011).

Fresh Harvest argues that it did not breach a contract with Sarmiento because no employment contract ever existed between Fresh Harvest and Sarmiento. *See* Sarmiento Motion, ECF No. 28-1 at 10 (citing Ridaura Decl., ECF No. 28-2 ¶ 9; Rava Decl., ECF No. 28-2 ¶ 3). In response, Sarmiento argues that since he was in "corresponding employment" with H-2A workers, there are triable issues of material fact as to whether the required terms of Fresh Harvest's H-2A job orders constituted a work contract with Sarmiento under the H-2A regulations. *See* Opposition, ECF No. 125 at 14–15 (citing 20 CFR §§ 655.103(b), 655.122(q)). Sarmiento points to his briefing and evidence regarding the existence of an employment relationship between Fresh Harvest and Sarmiento in support of his claim that Fresh Harvest was his "employer" under the H-2A regulations. *See id.* at 15. On reply, Fresh Harvest argues that Fresh Foods was Sarmiento's employer—not Fresh Harvest. *See* Reply, ECF No. 139 at 11.

The Court agrees with Sarmiento. As a threshold matter, the Court finds that the H-2A regulations indicate that a direct contractual relationship may have existed between Fresh Harvest

and Sarmiento provided Sarmiento was in "corresponding employment" with Fresh Harvest's H-2A workers. The H-2A regulations indicate that an employer "must provide to an H-2A worker no later than the time at which the worker applies for the visa, or to a worker in corresponding employment no later than on the day work commences, a copy of the work contract between the employer[.]" 20 C.F.R. § 655.122(q). Further, the H-2A regulations provide that "[i]n the absence of a separate, written work contract entered into between the employer and the worker, the required terms of the job order and the certified *Application for Temporary Employment Certification* will be the work contract." *Id.*; *see Ruiz v. Fernandez*, 949 F.Supp.2d 1055, 1072 (E.D. Wash. 2013). These regulations indicate that H-2A job orders may serve as contracts with domestic workers in corresponding employment with an employer's H-2A workers. *See also* 20 C.F.R. § 655.103(b) (defining "job offer" as "[t]he offer made by an employer or potential employer of H-2A workers to both U.S. and H-2A workers describing all the material terms and conditions of employment").

Next, the Court considers whether there is a genuine issue of material fact as to whether Sarmiento was in "corresponding employment" with Fresh Harvest's H-2A workers. The H-2A regulations define "corresponding employment" as "[t]he employment of workers who are not H-2A workers by an employer who has an approved H-2A *Application for Temporary Employment Certification* in any work included in the job order, or in any agricultural work performed by the H-2A workers." 20 C.F.R. § 655.103. Accordingly, the "corresponding employment" inquiry involves two questions: (1) whether Fresh Harvest was an "employer" of Sarmiento under the H-2A regulations and (2) whether Sarmiento's work was "any work included in the job order, or in any agricultural work performed by the H-2A workers." *Id.*

First, the Court considers whether Fresh Harvest could be considered an "employer" of Sarmiento under the H-2A regulations. The H-2A regulations define an employer as an entity that:

> (1) Has a place of business (physical location) in the U.S. and a means by which it may be contacted for employment;
>
> (2) Has an employer relationship (such as the ability to hire, pay, fire, supervise or otherwise control the work of employee) with respect to an H-2A worker or a worker in corresponding employment; and
>
> (3) Possesses, for purposes of filing an Application for Temporary

Employment Certification, a valid Federal Employer Identification
Number (FEIN).

20 C.F.R. § 655.103.  Sarmiento argues that there are triable issues as to whether Fresh Harvest was his "employer" based on the evidence he provides of Fresh Harvest's supervision and other forms of control it had over Sarmiento during his employment with Fresh Foods.  *See* Opposition, ECF No. 125 at 15.  In response, Fresh Harvest argues that Sarmiento's employer was Fresh Foods, and Fresh Harvest never had the ability to hire, pay, fire, supervise, or otherwise control Sarmiento's work.  *See* Reply, ECF No. 13.

The parties' only dispute appears to be as to the second factor of 20 C.F.R. § 655.103, and the Court has already found that there are genuine disputes of material fact as to Fresh Harvest's ability to "hire, pay, fire, supervise or otherwise control the work of" Sarmiento.  For example, there are disputes of fact as to Fresh Harvest's ability to supervise Sarmiento's work, including Fresh Harvest's ability to set Sarmiento's schedule and to coordinate with him about where to pick up harvest loads.  *See* Chan Decl., ECF No. 126, Ex. D, Rava Dep. Tr. 130:21–23; *id.*, Ex. E, Ramos Dep. Tr. 64:23–65:1; Sarmiento Decl., ECF No. 129 ¶ 5; Michalak Decl., ECF No. 139-3, Ex. C, Ramos Dep. Tr. 67:20–24.

Second, the Court considers whether Sarmiento performed any work included in Fresh Harvest's H-2A job orders.  Fresh Harvest does not appear to dispute that Sarmiento performed work that was included in its H-2A job orders.  Further, Sarmiento provides ample evidence that he performed the same work as Fresh Harvest's H-2A truck drivers.  *See, e.g.*, Chan Decl., ECF No. 126, Ex. B, Diaz Dep. Tr. 99:21–100:2 (H-2A and domestic truck drivers drove to the same places, hauled the same products, and had the same job title of "truck driver"); *id.*, Ex. D, Rava Dep. Tr. 138:15016 (H-2A and domestic truck drivers "do the same job"); *id.*, Ex. B, Diaz Dep. Tr. 101:2–7, 101:11–20 (H-2A truck drivers received the same training).  Accordingly, the Court finds that there are disputed facts as to whether Sarmiento was in corresponding employment with Fresh Harvest's H-2A workers.

b.   Third-Party Beneficiary Relationship

As a further response to Fresh Harvest's argument that it did not have a contractual

31

relationship with Sarmiento, Sarmiento argues that he was an intended third-party beneficiary of certain Fresh Harvest contracts. "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Cal. Civ. Code § 1559. The promise in such a situation is treated as having been made directly to the third party. *See Outdoor Servs., Inc. v. Pabagold, Inc.*, 185 Cal.App.3d 676, 681 (1986) (citing *Shell v. Schmidt*, 126 Cal.App.2d 279, 290 (1954)). It is not necessary that an express beneficiary be specifically identified in the contract; he or she may enforce it if he or she is a member of a class for whose benefit the contract was created. *Id.* (citations omitted). Section 1559 excludes enforcement of the contract by persons who are only incidentally or remotely benefited by it. *Id.* (citations omitted).

Sarmiento argues that he was an intended third-party beneficiary of (1) Fresh Harvest's H-2A job order contracts and (2) Fresh Harvest's Customer Harvester Services Agreements with Fresh Foods. *See* Opposition, ECF No. 125 at 16. Sarmiento argues that these contracts expressly required Fresh Harvest to offer jobs to willing and qualified domestic workers like Sarmiento and to pay such workers the higher of the AEWR or prevailing wage, which made him an intended third-party beneficiary under California law. *See id.* Sarmiento argues that the central concern of the H-2A statute and regulations in protecting domestic workers like Sarmiento supports the fact that he is an intended beneficiary of the contracts. *See id.* In response, Fresh Harvest argues that Sarmiento would be at most an incidental beneficiary, not an intended beneficiary, due to the lack of relationship between Sarmiento and Fresh Harvest and the fact that Sarmiento provided no contractual consideration to Fresh Harvest. *See* Reply, ECF No. 139 at 11–12 (citing *Martinez v. Socoma Cos.*, 11 Cal. 3d 394, 400 (1974)).

The Court agrees with Sarmiento that there are disputed issues of fact. In support of his position that he was a third-party beneficiary of Fresh Harvest's job orders and contracts, Sarmiento points to contractual provisions that pertain to domestic workers in "Corresponding Employment" with Fresh Harvest under the H-2A regulations. *See* Chan Decl., ECF No. 126, Ex. M at PLS00019 ("The terms of this job order apply to H-2A and corresponding domestic workers defined in 20 CFR Section 655.103 (b) *who are employed by this employer* at this worksite and during the specific period herein.") (emphasis added); *id.*, Ex. 105 at FHI00529–30 ("[Fresh Harvest] agrees to offer

32

1   H-2A workers and any other worker who would be classified as being as being [sic] engaged in

2   Corresponding Employment (as the term is defined in 20 C.F.R. § 655.103(b)) all the required

3   services, materials, and conditions of employment required set out at 20 C.F.R. § 655.122 (a) thru

4   (q)[.]"); Ex. 56 at FHI0036–37 (same).  As the Court found above, there are genuine disputes of

5   material fact as to whether Sarmiento was in "corresponding employment" to Fresh Harvest's H-

6   2A employees under the H-2A regulations.  20 C.F.R. § 655.103(b).

7       Accordingly, there are genuine disputes of material fact as to whether Sarmiento was a third-

8   party beneficiary to Fresh Harvest's H-2A job orders.  A reasonable juror could conclude that the

9   job orders and contracts in question were "made expressly for [Sarmiento's] benefit" as a worker in

10  corresponding employment with Fresh Harvest's H-2A workers.  Cal. Civ. Code § 1559; *see Shell*,

11  126 Cal.App.2d at 290 ("All that section 1559 requires is that the contract be 'made expressly for

12  the benefit of a third person,' and 'expressly' simply means 'in an express manner; in direct or

13  unmistakable terms; explicitly; definitely; directly.'") (citations omitted); *Prouty v. Gores Tech.

14  Grp.*, 121 Cal.App.4th 1225, 1233 (2004) (whether a third party is an intended beneficiary of a

15  contract is a question of law "where . . . the issue can be answered by interpreting the contract as a

16  whole[.]"); *Zigas v. Sup. Ct.*, 120 Cal.App.3d 827, 834–41 (1981) ("[W]e believe the agreement

17  itself manifests an intent to make tenants direct beneficiaries, not incidental beneficiaries[.]").

18                                    * * *

19      Based on the above reasoning, the Court finds that there are genuine disputes of material fact

20  as to whether Sarmiento had a contractual relationship with Fresh Harvest, either directly or as a

21  third-party beneficiary.  Accordingly, the Court DENIES Fresh Harvest's motion for summary

22  judgment as to Sarmiento's breach of contract claims.

23          **4.  UCL Unfairness Prong**

24      Fresh Harvest does not move for summary judgment as to this claim.  *See* Sarmiento Motion,

25  ECF No. 28-1 at 1.  Sarmiento argues that summary judgment must therefore be denied, because his

26  claim under the UCL "unfair" prong does not depend on the issues Fresh Harvest addresses in its

27  briefing, like whether Fresh Harvest was Sarmiento's employer.  *See* Opposition, ECF No. 125 at

28  12.  Sarmiento argues that he alleged facts in the First Amended Complaint to support a claim under

United States District Court
Northern District of California

1    the UCL "unfair" prong based on the fact that Fresh Harvest paid the lower adverse effect wage rate

2    ("AEWR") to H-2A truck drivers rather than the applicable prevailing wage rate, which was higher.

3    *See id.*  At the December 9, 2021 hearing, Fresh Harvest argued that the Court should grant summary

4    judgment on Sarmiento's UCL "unfair" prong claim, because Sarmiento did not adequately allege

5    this theory.

6         The Court agrees with Sarmiento.  Sarmiento's UCL claim clearly alleges violations of both

7    the "unlawful" and "unfair" prongs of the UCL.  *See* FAC, ECF No. 53 ¶¶ 185–94.  Further,

8    Sarmiento points to allegations throughout the First Amended Complaint supporting his UCL

9    "unfair" prong theory. *See, e.g., id.* ¶¶ 57–60.  Accordingly, the Court finds that if Fresh Harvest

10   sought summary judgment regarding Sarmiento's UCL claim, it was required to brief the issue in

11   its Motion.  Since Fresh Harvest did not, the issue of whether the Court should grant summary

12   judgment as to Sarmiento's UCL "unfair" prong claim is not properly before the Court.

13        Fresh Harvest's summary judgment motion as to Sarmiento's UCL claim is therefore

14   DENIED.

15                                          * * *

16        Having found disputed material facts on all of the issues presented, the Court does not wish

17   to convey that Sarmiento's evidence appears strong or persuasive.  As Fresh Harvest recognizes,

18   Sarmiento's claims all come down to a determination of whether Fresh Harvest was his joint

19   employer.  Where, as here, there are multi-factor tests that must be applied and the Court is

20   prohibited from weighing any evidence or even determining in the totality of the circumstances

21   which factors are most important, even slight evidence and reasonable inferences defeat summary

22   judgment.  It is the Court's conclusion that Sarmiento's evidence comfortably crosses the threshold

23   of sufficiency to defeat summary judgment.

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

United States District Court
Northern District of California

34

**IV.   ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.   Fresh Harvest's summary judgment motion as to Sarmiento's AWPA claim is DENIED;

2.   Fresh Harvest's summary judgment motion as to Sarmiento's California Labor Code claims is DENIED;

3.   Fresh Harvest's summary judgment motion as to Sarmiento's breach of contract claim is DENIED;

4.   Fresh Harvest's summary judgment motion as to Sarmiento's UCL claim is DENIED; and

5.   Fresh Harvest's summary judgment motion against Luevano-Vaca is MOOT.

Dated:  March 10, 2022

_____
BETH LABSON FREEMAN
United States District Judge